815 F.2d 1495
 259 U.S.App.D.C. 294
 The WESTERN UNION TELEGRAPH COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Aeronautical Radio, Inc., Pacific Bell, et al., Centel
Corporation, Teltec Saving Communications Co., et al., GTE
Corporation, Dow Jones & Company, Inc., ROLM Corporation,
Roseville Telephone Company, et al., RCA Global
Communications, Inc., Department of Public Utility Control
of the State of Connecticut, MCI Telecommunications
Corporation, Ad Hoc Telecommunications Users Committee,
Telesphere Network, Inc., U.S. Telephone, Inc., American
Telephone and Telegraph Company, Satellite Business Systems,
United Telephone System, Inc., Ameritech Operating
Companies, et al., United States Transmission Systems, Inc.,
Mountain States Telephone and Telegraph Co., et al., ITT
Communications Services, Inc., Intervenors.
The WESTERN UNION TELEGRAPH COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
MCI Telecommunications Corporation, Bell Operating
Companies, Illinois Bell Telephone Co., et al., American
Telephone and Telegraph Company, the Mountain States
Telephone and Telegraph Co., et al., RCA Global
Communications, Inc., ITT Communications Services, Inc., GTE
Sprint Communications Corporation, Pacific Bell and Southern
New England Telephone Company, Satellite Data Broadcast
Networks, Inc., Satellite Business Systems, United Telephone
System, Inc., Dow Jones & Company, Inc., the Competitive
Telecommunications Association, American Satellite Company,
Intervenors.
MCI TELECOMMUNICATIONS CORPORATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Illinois Bell Telephone Co., et al., Mountain States
Telephone and Telegraph Co., et al., American Telephone and
Telegraph Company, GTE Sprint Communications Corporation,
Western Union Telegraph Company, Bell Operating Companies,
Satellite Data Broadcast Networks, Inc., Dow Jones &
Company, Inc., United Telephone System, Inc., Satellite
Business Systems, American Satellite Company, ITT
Communications Services, Inc., Intervenors.
The WESTERN UNION TELEGRAPH COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
ITT Communications Services, Inc., MCI Telecommunications
Corporation, Bell Operating Companies, GTE Sprint
Communications Corporation, Roseville Telephone Company, et
al., American Telephone and Telegraph Company, Satellite
Business Systems, American Satellite Company, Mountain
States Telephone and Telegraph Co., et al., US Telecom,
Inc., Intervenors.
MCI TELECOMMUNICATIONS CORPORATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
ITT Communications Services, Inc., Bell Operating Companies,
GTE Sprint Communications Corporation, Roseville Telephone
Company, et al., American Telephone and Telegraph Company,
Satellite Business Systems, American Satellite Company,
Mountain States Telephone and Telegraph Co., et al., Intervenors.
MCI TELECOMMUNICATIONS CORPORATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Bell Operating Companies, GTE Sprint Communications
Corporation, Roseville Telephone Company, et al., American
Telephone and Telegraph Company, Ameritech Operating
Companies, Western Union Telegraph Company, American
Broadcasting Companies, et al., National Association of
Broadcasters, GTE Corporation, ITT Communications Services,
Inc., Intervenors.
MCI TELECOMMUNICATIONS CORPORATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Bell Operating Companies, GTE Sprint Communications
Corporation, Roseville Telephone Company, et al., American
Telephone and Telegraph Company, Ameritech Operating
Companies, Western Union Telegraph Company, Ad Hoc
Telecommunications Users Committee, Public Utilities
Commission on the State of California, GTE Corporation, ITT
Communications Services, Inc., Intervenors.
MCI TELECOMMUNICATIONS CORPORATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Ameritech Operating Companies, Ad Hoc Telecommunications
Users Committee, Bell Operating Companies, U.S.
Telephone, Inc., ITT Communications
Services, Inc., Intervenors.
MCI TELECOMMUNICATIONS CORPORATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Western Union Telegraph Company, Ameritech Operating
Companies, Bell Operating Companies, ITT
Communications Services, Inc., Intervenors.
MOUNTAIN STATES TELEPHONE AND TELEGRAPH COMPANY, et al., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
MCI Telecommunications Corporation, Ameritech Operating
Companies, American Telephone and Telegraph Company, Western
Union Telegraph Company, Roseville Telephone Company, et
al., Competitive Telecommunications Association, Bell
Operating Companies, US Telecom, Inc., ITT Communications
Services, Inc., Ad Hoc Telecommunications Users Committee,
Intervenors.
 Nos. 84-1177, 84-1641, 84-1642, 85-1115, 85-1124, 85-1148,
85-1151, 85-1183, 85-1204 and 85-1300.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 17, 1987.
Decided April 3, 1987.
 
 Petitions for Review of Orders of the Federal Communications commission.
 William J. Byrnes, with whom Michael H. Bader, Kenneth A. Cox, Theodore D. Kramer and John M. Scorce, Washington, D.C., were on the brief, for MCI Telecommunications Corp., petitioner in Nos. 84-1642, 85-1124, 85-1146, 85-1151, 85-1183 and 85-1204, and intervenor in Nos. 84-1177, 84-1641, 85-1115 and 85-1300. Robert Michelson and Thomas R. Gibbon, Washington, D.C., also entered an appearance for MCI Telecommunications Corp.
 L. Andrew Tollin, with whom Robert B. McKenna, Jr. and Kenneth D. Patrich, Washington, D.C., were on the brief, for Mountain States Telephone and Telegraph Co., et al., petitioners in No. 85-1300 and intervenors in Nos. 84-1177, 84-1641, 84-1642, 85-1115 and 85-1124.
 H. Richard Juhnke, Joel Yohalem, Arthur H. Simms, Lawrence P. Keller, Thomas J. Casey and Terrence J. Leahy, Washington, D.C., were on the brief, for the Western Union Telegraph Co., petitioner in Nos. 84-1177, 84-1641 and 85-1115, and intervenor in Nos. 84-1642, 85-1148, 85-1151, 85-1204 and 85-1300. Peter G. Wolfe also entered an appearance for the Western Union Telegraph Co.
 Linda L. Oliver, Counsel, F.C.C., with whom Jack D. Smith, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, John E. Ingle, Counsel, F.C.C., and Robert B. Nicholson and Andrea Limmer, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents. Bruce E. Fein, Counsel, F.C.C., and Nancy C. Garrison and Catherine G. O'Sullivan, Attys., Dept. of Justice, Washington, D.C., also entered appearances for respondents.
 
 
 1
 Alfred Winchell Whittaker, Washington, D.C., with whom Thomas J. Reiman, Chicago, Ill., was on the brief for intervenors, Ameritech Operating Companies, et al., in Nos. 84-1177, 84-1641, 84-1642, 85-1148, 85-1151, 85-1183, 85-1204 and 85-1300.
 
 
 2
 Jules M. Perlberg, Jonathan S. Hoak, Chicago, Ill., and J. Richard Devlin, Long Valley, N.J., were on the brief for intervenor, American Telephone and Telegraph Company, in Nos. 84-1177, 84-1641, 84-1642, 85-1115, 85-1124, 85-1148 and 85-1151. Lowell Miller, Basking Ridge, N.J., also entered an appearance for intervenor, American Telephone and Telegraph Co.
 
 
 3
 Raymond F. Scully, Alan B. Sternstein and Katherine I. Hall, Washington, D.C., were on the brief for intervenor, Bell Operating Companies, in Nos. 84-1177, 84-1641, 84-1642, 85-1115, 85-1124, 85-1148, 85-1151, 85-1183 and 85-1204.
 
 
 4
 Peter Tannenwald, Washington, D.C., entered an appearance for intervenor, Teltec Saving Communications Co., in No. 84-1177.
 
 
 5
 Theodore D. Frank, Washington, D.C., entered an appearance for intervenor, Centel Corp., in No. 84-1177.
 
 
 6
 Thomas Pace, Princeton, N.J., entered an appearance for intervenor, Dow Jones and Co., Inc., in Nos. 84-1177, 84-1641 and 84-1642.
 
 
 7
 James R. Hobson, Mitchell F. Brecher, and Richard McKenna, Washington, D.C., entered appearances for intervenor, GTE Corp., in Nos. 84-1178, 85-1148 and 85-1151.
 
 
 8
 Mary Jo Manning, Washington, D.C., entered an appearance for intervenor, ROLM Corp., in No. 84-1177.
 
 
 9
 Gary C. Tucker, Michael L. Glaser, Denver, Colo., and Francis E. Fletcher, Jr., Washington, D.C., entered appearances for intervenors, Roseville Telephone Co., et al., in Nos. 84-1177, 85-1115, 85-1124, 85-1148 and 85-1151.
 
 
 10
 Alexander P. Humphrey, Washington, D.C., and Robert F. Heath, Princeton, N.J., entered appearances for intervenor, RCA Global Communications, Inc., in Nos. 84-1177 and 84-1641.
 
 
 11
 William B. Gundling, Hartford, Conn., entered an appearance for intervenor, Dept. of Public Utility Control of the State of Conn., in No. 84-1177.
 
 
 12
 John A. Ligon, New York City, entered an appearance for intervenor, U.S. Transmission Systems, Inc., in Nos. 84-1177, 84-1641, 85-1115, 85-1124, 85-1151, 85-1183 and 85-1204.
 
 
 13
 Joseph M. Kittner, James S. Blaszak and Timothy J. Cooney, Washington, D.C., entered appearances for intervenor, Ad Hoc Telecommunications Users Committee, in Nos. 84-1177, 85-1151 and 85-1183.
 
 
 14
 Leo I. George, Washington, D.C., entered an appearance for intervenors, Telesphere Network, Inc. and U.S. Telephone, Inc., in No. 84-1177.
 
 
 15
 Kevin H. Cassidy, McLean, Va., Jeffrey Matsuura, Washington, D.C., J. Manning Lee, McLean, Va., William E. Willis, New York City, Margaret K. Pfeiffer and Robert B. Bell, Washington, D.C., entered appearances for intervenor, Satellite Business Systems, in Nos. 84-1177, 84-1641, 84-1642, 85-1115 and 85-1124.
 
 
 16
 Carolyn C. Hill, Washington, D.C., entered an appearance for intervenor, United Telephone System, Inc., in Nos. 84-1177, 84-1641 and 84-1642.
 
 
 17
 John L. Bartlett, Michael Yourshaw and Robert J. Butler, Washington, D.C., entered appearances for intervenors, Aeronautical Radio, Inc., and Satellite Data Broadcast Network, Inc., in No. 84-1177.
 
 
 18
 Liam S. Coonan, Washington, D.C., William C. Sullivan, Topeka, Kan., and Linda S. Legg, St. Louis, Mo., entered appearances for intervenor, Southwestern Bell Telephone Co., in Nos. 84-1177, 84-1641 and 84-1642.
 
 
 19
 Michael B. Fingerhut and Leon M. Kestenbaum, Washington, D.C., entered appearances for intervenor, GTE Sprint Communications Corp., in Nos. 84-1641, 84-1642, 85-1115, 85-1124, 85-1148 and 85-1151.
 
 
 20
 Randall B. Lowe and Thomas K. Crowe, Washington, D.C., entered appearances for intervenor, Competitive Telecommunications Ass'n, in No. 84-1641.
 
 
 21
 Joan M. Griffin entered an appearance for intervenor, American Satellite Co., in Nos. 84-1641, 84-1642, 85-1115 and 85-1124.
 
 
 22
 Daniel A. Huber, Washington, D.C., entered an appearance for intervenor, U.S. Telecom, Inc., in Nos. 85-1115 and 85-1183.
 
 
 23
 Henry L. Baumann and Julian L. Shepard, Washington, D.C., entered appearances for intervenor, National Ass'n of Broadcasters, Inc., et al., in No. 85-1148.
 
 
 24
 Joseph DeFranco and Howard Monderer, Washington, D.C., entered appearances for intervenors, American Broadcasting Companies, Inc., et al., in No. 85-1148.
 
 
 25
 J. Calvin Simpson and Peter G. Fairchild, San Francisco, Cal., entered appearances for intervenor, Public Utilities Com'n of the State of Cal., in No. 85-1151.
 
 
 26
 Before WALD, Chief Judge, and BORK and BUCKLEY, Circuit Judges.
 
 
 27
 Opinion for the Court filed by Circuit Judge BORK.
 
 BORK, Circuit Judge:
 
 28
 We are called on to review the validity of three orders entered by the Federal Communications Commission. The orders abrogated certain procedural provisions of a settlement agreement, thus clearing the way for the Commission more promptly to approve changes in rates that had been set initially in that same agreement. We find that the Commission erred, and we reverse and remand for further proceedings.
 
 I.
 
 29
 In the wake of the American Telephone and Telegraph Company divestiture, the company was exposed to competition from other carriers in the long distance market.[1] These other carriers typically lease special access facilities from local telephone companies in order to complete transmission of their long distance services. In 1975, many of these carriers entered into a settlement agreement with AT & T and the local telephone companies, which AT & T then owned. The agreement, which established compromise rates for the leasing of special access facilities and set specific procedures for changing those rates in the future, was upheld by this court. See Carpenter v. FCC, 539 F.2d 242 (D.C.Cir.1976).
 
 
 30
 The schedule of rates established in that agreement has been a source of contention ever since. In 1979, AT & T and the local telephone companies filed rate increases but later withdrew that filing. See AT & T, 74 F.C.C.2d 226, 255 (1979). The companies filed increases again in 1980, which the Commission accepted but this court struck down for failure to comply with the terms of the agreement. See MCI Telecommunications Corp. v. FCC, 665 F.2d 1300 (D.C.Cir.1981). In 1982, the Commission rejected another filing for that reason. See AT & T, 92 F.C.C.2d 896, 906 (1982). In each instance, the attempt to increase rates was frustrated by two particular provisions of the original settlement agreement: that new rates shall not become effective on less than six months' notice; and that new rates shall be accompanied by enough data to show that they are cost-supported. See Settlement Agreement paragraphs 1 n. 2, 3(b), Joint Appendix ("J.A.") at 12, 14.
 
 
 31
 The filings at issue in this case have an especially tortuous history. AT & T and the local telephone companies filed an increase in special access rates on October 3, 1983. The Commission initially purported to abrogate the provision for six months' notice, declaring that the increase would take effect on January 1, 1984 (which would have coincided with the AT & T divestiture). On reconsideration, however, the Commission conceded that it could find "no substantial public interest reasons" to justify such haste. Reconsideration Order, 48 Fed.Reg. 42,984, 43,016 (1983). After further investigation, the Commission found that the proposed rate increases were unlawful and had to be "substantially replaced." See Memorandum Opinion and Order, Investigation of Access and Divestiture Related Tariffs, 97 F.C.C.2d 1082, 1102 (1984).
 
 
 32
 After the divestiture occurred on January 1, 1984, the local telephone companies filed new proposed increases on March 15 and 19, 1984. The Commission asserted that these increases could take effect on April 3--less than three weeks later--because the previous filing had commenced the running of the six months' notice period. The Commission's investigations, however, soon uncovered more difficulties with the proposed rates. The effective date was postponed further, first to June 13, and then later to November 13. But on November 9, the Commission concluded that these proposed increases too were unlawful. See Memorandum Opinion and Order, Investigation of Access and Divestiture Related Tariffs, 49 Fed.Reg. 50,457, 50,457 (1984). The proposed rate structure was found to be "unreasonable and unsupported." Id. at 50,473.
 
 
 33
 At this point, the Commission confronted a dilemma. It had concluded that the existing rates were so low that they violated the Communications Act's prohibitions against unjust or unreasonable rates and undue preferences. See 49 Fed.Reg. at 50,470; see also 47 U.S.C. Secs. 201(b), 202(a) (1982). But it had also been forced to rule that the new filing was unlawful. The Commission took two steps to expedite matters. First, it prescribed an immediate 20% increase in existing rates, as a transitional measure, which commenced on November 13, 1984. Second, it directed that another rate increase be filed by December 3, 1984, to become effective on January 17, 1985. 49 Fed.Reg. at 50,469-71. Recognizing that these steps might be seen once again as inconsistent with the terms of the original settlement agreement, the Commission reiterated that the proceedings, taken as a whole, had given affected carriers the required six months' notice, and stated that in any event it was exercising its power to abrogate the original settlement agreement as disserving the public interest. See id. at 50,470. After the new rate increases were filed and subjected to further investigation, the Commission concluded that these rates were "generally acceptable" and approved them subject to certain specific modifications. See Memorandum Opinion and Order, Investigation of Access and Divestiture Related Tariffs, 50 Fed.Reg. 12,637, 12,637-38, 12,649 (1985). The final revised rates were filed on March 15, and took effect on April 1, 1985.
 
 II.
 
 34
 Having exhausted their administrative remedies, two long distance carriers seek review of this series of orders that finally led to an increase in the special access rates. They contend that the Commission acted unlawfully by approving rates that were not implemented in accordance with the mandatory procedures set out in the original settlement agreement--namely, the requirements of six months' notice and adequate cost-support data. The Commission advances two justifications.
 
 A.
 
 35
 The broader justification is that the Commission abrogated the settlement agreement altogether, and thus was under no obligation to comply with its terms. Under the Sierra-Mobile doctrine, the Commission has the power to prescribe a change in contract rates when it finds them to be unlawful, see FPC v. Sierra Pacific Power Co., 350 U.S. 348, 353-55, 76 S.Ct. 368, 371-72, 100 L.Ed. 388 (1956), and to modify other provisions of private contracts when necessary to serve the public interest, see United Gas Co. v. Mobile Gas Corp., 350 U.S. 332, 344, 76 S.Ct. 373, 380, 100 L.Ed. 373 (1956).[2]
 
 
 36
 In its order of November 9, 1984, the Commission purported to abrogate the entire settlement agreement as inconsistent with the public interest. See 49 Fed.Reg. at 50,470. Its only justification for doing so, however, was that the rates established in that initial agreement were unlawful. The Commission made no finding that the requirements of six months' notice and of adequate cost-support data were detrimental to the public interest. Indeed, the Commission did not discuss these particular provisions at all.[3] In its order of March 8, 1985, the Commission reiterated these rather conclusory arguments, adding only that "it is contrary to the public interest to permit the rate disparity created by the ... Agreement to continue in effect." See Memorandum Opinion and Order, Investigation of Access and Divestiture Related Tariffs, 102 F.C.C.2d 1007, 1028-30 (1985). To the extent this language offered any justification whatsoever, it would be merely that speed was essential, and the six-month and cost-support requirements were obstacles to the necessary speed. But it would always have been contemplated by the companies that when the Commission eventually found increases to be justified, the reason would be that existing rates were too low or otherwise outmoded. Despite this obvious expectation, the six-month and cost-support requirements were made an integral part of the original settlement agreement, which the Commission approved. They were understandably thought to ensure appropriate and full consideration of any proposed rate increases before they would become effective. There is no reason to think that these clauses did not continue to serve those useful purposes,[4] and the Commission never offered adequate reasons for jettisoning the provisions. In its very general treatment of the settlement agreement, the Commission did not reweigh in any detail the tradeoff made in these provisions between expedition and care. Thus, we do not think the Commission justified abrogating the settlement agreement.
 
 B.
 
 37
 The Commission also argues, more narrowly, that these two requirements had been fulfilled before it permitted the final revised rates to take effect on April 1, 1985. Our assessment of this contention requires us to review the Commission's reading of the settlement agreement. This court has recently reaffirmed that the law in this circuit requires a reviewing court to defer to an agency's interpretation of a settlement agreement concerning matters within its statutory field of administration, absent certain special factors that do not apply here. See National Fuel Gas Supply Corp. v. FERC, 811 F.2d 1563, 1569-72 (1987); see also MCI Telecommunications Corp. v. FCC, 712 F.2d 517, 532-33 & n. 18 (D.C.Cir.1983). Applying the same standard in this case, we must defer to the Commission's understanding of the terms of the original settlement agreement.
 
 
 38
 The Commission concluded that the proposed increases were adequately supported by cost-support data as required by the agreement. The agreement requires compliance with the Commission's own rule on this subject. See Settlement Agreement p 1 n. 2, J.A. at 12; 47 C.F.R. Sec. 61.38 (1984). The rule sets out a number of materials that must be submitted, including an explanation of the changes, the reasons for the filing, the ratemaking methodology employed, and more specific economic information to support the changes. Id. The sole issue here is whether the rates filed in December of 1984, which ultimately became effective, complied with this rule. Petitioner MCI argues that the proposed rates were not accompanied by a cost-of-service study for the previous twelve months, that special studies of certain revenue requirements were resubmitted from earlier filings without revisions, and that inadequate support was provided to justify increases in non-recurring charges, as two commissioners had stated in their dissent from final approval of these increases. Brief for Petitioner MCI Telecommunications Corp. at 70-72. In response, the Commission claims that it reasonably concluded that the cost-support requirement was satisfied.
 
 
 39
 We uphold the Commission on this point. The agreement requires compliance with the rule. Here compliance was by no means perfect, but it was certainly substantial. An extensive database on cost-support had been developed over the course of these proceedings, supplemented on several occasions by responses to the Commission's requests for additional material. Though the December 3 filing deviated in some respects from the strict terms of Rule 61.38, we believe that these deficiencies were not critical when taken in light of the record as a whole. Cf. American Farm Lines v. Black Ball Freight Serv., 397 U.S. 532, 538-39, 90 S.Ct. 1288, 1292, 25 L.Ed.2d 547 (1970) (upholding agency's authority to decide that procedural requirements were fulfilled by adequate compliance rather than literal exactness).
 
 
 40
 This conclusion is bolstered by the fact that a reviewing court is required to defer not only to the Commission's reading of this settlement agreement but also to an agency's interpretation of its own rules. See Jewett v. Commissioner, 455 U.S. 305, 318, 102 S.Ct. 1082, 1090, 71 L.Ed.2d 170 (1982); Udall v. Tallman, 380 U.S. 1, 16-17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Here the Commission found that the December 3 filing did comply with the requirements of Rule 61.38. We agree with respondents that deference to such a finding is particularly appropriate where the rule concerns procedural matters, and is designed to assist the agency in conducting its investigations of rate filings. The rule is intended to be an aid rather than a hindrance; indeed, courts have upheld the Commission's waiver of these requirements in individual cases. See, e.g., Aeronautical Radio, Inc. v. FCC, 642 F.2d 1221, 1235 (D.C.Cir.1980).
 
 
 41
 This view is also borne out by two other decisions of this court. In Associated Press v. FCC, 448 F.2d 1095 (D.C.Cir.1971), we held that under the statute the Commission has considerable discretion to determine when proposed rates are supported by adequate cost data. Id. at 1104. Even more to the point, in RCA Global Communications, Inc. v. FCC, 717 F.2d 1429 (D.C.Cir.1983), we construed this very provision of the initial settlement agreement, and we held that it simply precluded waiver of the cost-support requirements. Thus we found that the agreement confined the Commission's ability to do away with the cost-support requirements altogether without necessarily limiting its accepted authority to determine, in a reasonable manner, when a party to a rate filing had substantially complied with those requirements. Id. at 1433-36. The Commission's determination in this case was well within its accepted authority.
 
 
 42
 The Commission also concluded that its approval of the final revised rates, which became effective on April 1, 1985, complied with the six months' notice requirement. We find that this assertion fails to pass muster even under a generous standard of deferential review. The Commission's strongest argument is that what these petitioners bargained for in the notice provision was delay, and plenty of delay has occurred, so the provision has been met. But paragraph 3(b) of the settlement agreement states, more specifically, that new rates "will not become effective until six months from the date of filing." Settlement Agreement p 3(b), J.A. at 14. The purpose of this provision was not to produce delay for its own sake but to give the long-distance carriers time to analyze and comment upon the particular rate filing. For that reason, the provision flatly requires six months' notice, not some ill-defined amount of delay in general.
 
 
 43
 The Commission does, however, offer an argument grounded on the language of the agreement: the rate filings in October of 1983 and March of 1984 commenced the count of six months, and thus ample notice had been provided before the final revised rates went into effect on April 1, 1985. We cannot accept this view. As we have noted, both of these earlier rate filings were declared unlawful. Thus, they have no greater significance than the filings made in 1979, 1980, and 1982, each of which was later withdrawn or declared unlawful. The logic of the Commission's argument is that any rate filing, no matter how outlandish, would serve to put the petitioners on notice that in six months a completely different rate filing might be made and permitted to take effect immediately. We think this absurd.
 
 
 44
 The Commission contends that the only alternative to this reading is that rates must be not simply filed, but perfected (i.e., not be subject to any further modifications) six months before they go into effect. If this were correct, the notice provision would be somewhat more of a handicap to the Commission than anyone may have realized at the time the settlement agreement was approved. But it is not correct. The agreement states that rates may not take effect until at least six months from the date they are filed. Investigations and modifications by the Commission are clearly contemplated as normal parts of the regulatory scheme.[5] As long as the final revised rates represent a modified version of the rates that were filed originally, then they are for our purposes the same rates, and the six months are counted from the date of the original filing.
 
 
 45
 For example, the final rate schedule in this case was originally filed on December 3, 1984. The final revised rates, including all revisions and adjustments necessary to comply with the results of the Commission's investigations, were filed on March 15, 1985. We have already said that the Commission erred in allowing these rates to take effect on April 1, 1985. But we have not specified whether the rates could have taken effect on June 3, 1985, which was six months from the date they were originally filed, or not until September 15, 1985, which was six months from the date that they were filed in their final modified form.
 
 
 46
 We conclude that the final revised rates could have taken effect on June 3, 1985. Unlike the earlier filings, this schedule of rates was not rejected entirely or found to be unlawful. Instead, the Commission found these rates to be "generally acceptable subject to specified revisions." 50 Fed.Reg. at 12,638. In particular, the underlying rate structure was approved in most of its details. Id. at 12,639, 12,641-46. After further examination, the Commission required additional changes in some of the rates to reflect, among other things, revised projections of demand, reallocation of certain costs, and recovery of certain investments. See 102 F.C.C.2d at 1009-13, 1017-18. The Commission consistently described these changes as "revisions," "modifications," and "adjustments" to the rates that had been filed on December 3, 1984. Some of these changes were not minor.[6] Nonetheless, we believe that the final revised rates can be accurately described as a modified version of those filed on December 3, 1984.
 
 III.
 
 47
 Our conclusion that the final revised rates could have taken effect on June 3, 1985, is not simply an overlong answer to the Commission's argument about how to read the six months' notice provision--it is critical to the disposition of this case. We have concluded that the Commission did not properly abrogate the settlement agreement, which remained in force. We have also found that the Commission's actions complied with the terms of that agreement except that the rate increases took effect too soon. Unless these new rates are themselves unlawful, the appropriate remedy in this case is an order of appropriate refunds from those who charged the special access rates to those who paid them. See, e.g., AT & T, 89 F.C.C.2d 369 (1982), aff'd sub nom. RCA Global Communications, Inc. v. FCC, 717 F.2d 1429 (D.C.Cir.1983).
 
 
 48
 The petitioning long distance carriers have raised no challenge to the legitimacy of the new rates other than their argument about cost-support data, which we rejected. The only challenge that we have not yet considered is raised by three local telephone companies. The final revised rates included a transition period from the rates set in the initial settlement agreement to the new rates approved by the Commission. The transition period comprised three stages: rates set at a 20% increase from the old rates, which were in effect between November 13, 1984, and April 1, 1985; rates set at 50% of the final revised rates, which obtained between April 1, 1985, and October 1, 1985; and rates set at 75% of the final revised rates, which obtained between October 1, 1985, and April 1, 1986. The petitioning companies claim that this transition was unlawful and that the final revised rates, which alone were cost-justified, should have become effective immediately.
 
 
 49
 We uphold the Commission on this point. This court has said that "the gradual implementation of new rates and policies is a standard tool of the Commission." National Ass'n of Regulatory Util. Comm'rs v. FCC, 737 F.2d 1095, 1135 (D.C.Cir.1984), cert. denied, 469 U.S. 1227, 105 S.Ct. 1224, 84 L.Ed.2d 364 (1985) ("NARUC "). In this case, the Commission was approving enormous increases even though it continued to harbor some questions and reservations about them. It recognized that "if the proposed rates prove to be too high, it is possible that some [carriers] could be seriously harmed before revisions and refunds could be made. This short-term harm might thus reduce possible competition in private line services in the longer run." 102 F.C.C.2d at 1021. To avoid this "rate shock," transitional rates were approved for all carriers who had been providing service under the terms of the settlement agreement. As this court has stated, "[t]he shift from one type of nondiscriminatory rate structure to another may certainly be accomplished gradually to permit the affected carriers, subscribers and state regulators to adjust to the new pricing system, thus preserving the efficient operation of the interstate telephone network during the interim." NARUC, 737 F.2d at 1135-36. The Commission also acknowledged that its decision would sanction a temporary rate disparity, but concluded that "the disparity is just and reasonable because it is relatively brief, is of a decreasing nature, and is necessary to avoid possibly deleterious, and perhaps irreversible, impacts on competition in the interexchange telecommunications market." Id. at 1027. We find this decision to be sensible, and that is enough to sustain it.
 
 IV.
 
 50
 Since no other challenges have been raised to the validity of the final revised rates that are currently in effect, we hold that they are valid. We find error in the Commission's decisions to allow a 20% rate increase to take effect on November 13, 1984, and to permit a further increase on April 1, 1985. No increase in rates could properly have been charged before June 3, 1985. We therefore reverse and remand to the Commission for further proceedings. The Commission shall calculate the appropriate monetary adjustments to be made, and in doing so is free to reconsider what transitional rates would have been appropriate in light of this opinion.
 
 
 
 [1]
 The background of the antitrust litigation that resulted in the divestiture can be found in United States v. American Tel. & Tel. Co., 552 F.Supp. 131 (D.D.C.1982), aff'd sub nom. Maryland v. United States, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). The local telephone companies were sundered from AT & T as a result of those decisions
 
 
 [2]
 Although the legal standard for changing contract rates (they must be "unlawful") differs from the standard for changing other contract provisions (they must disserve "the public interest"), in fact the two standards are not very different. Before changing rates, the Commission must make a finding that they are "unlawful" according to the terms of the governing statute, which typically requires a finding that existing rates are unjust, unreasonable, unduly discriminatory, or preferential. See 47 U.S.C. Secs. 202, 205 (1982); see also 15 U.S.C. Sec. 717c (1982) and 16 U.S.C. Sec. 824d (1982) (describing similar structure for regulation of the gas and power industries, the context in which the Sierra-Mobile doctrine originally arose). But as the Supreme Court recognized in Sierra, complaints about existing rates do not concern the Commission unless the problems raised are sufficiently serious to "adversely affect the public interest." See Sierra, 350 U.S. at 354-55, 76 S.Ct. at 372
 
 
 [3]
 The only discussion of whether the six months' notice provision comported with the public interest had occurred in 1983, when the Commission explicitly held that it could not justify abrogating this provision on public interest grounds. See 48 Fed.Reg. at 43,016
 
 
 [4]
 The Commission's own statements bear out the continued utility to all parties of a six-month period for examining any new rate filing. Even when the Commission approved the final revised rates, after three months of examination, it cautioned:
 Although we have thus reached a stage where the tariffs should become effective, we also recognize that many important issues remain to be fully addressed. Those issues will be included in our continuing investigation. However, we remain concerned, in view of the magnitude of the changes in rates and structures and the continuing problems and possible inaccuracies in the rate development process, that the rates may nevertheless be excessive, despite the adjustments required here.
 
 
 [102]
 F.C.C.2d at 1036
 
 
 [5]
 The agreement defines the six-month period to include "any suspension period which the Commission might impose incident to its statutory authority to initiate a hearing and investigation as to the lawfulness of those tariffs." Settlement Agreement p 3(b), J.A. at 14
 
 
 [6]
 The revised demand estimates, for example, are accurately described as "radically different" from earlier estimates, and in some cases these differences affected rates. 102 F.C.C.2d at 1010. To take another prominent example, some carriers had sought an extra piggyback increase in their rates to offset the lower demand that they expected now that rate increases were finally going to take effect. In denying this request, the Commission ordered these carriers to reduce their proposed rates by amounts ranging from 1% to 29%. Id. at 1011